**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
Joshua R. Wilner (State Bar No. 353949)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
         jglatt@bursor.com
         jwilner@bursor.com
         rmartin@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SPERO and ANAS RYADI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CIRCLE FOODS, LLC d/b/a CHANGING SEAS and BLUE SEA, LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs David Spero and Anas Ryadi ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Blue Circle Foods, LLC d/b/a Changing Seas and Blue Sea, LLC ("Defendants").  Plaintiffs make the following allegations pursuant to the investigations of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated who purchased Defendants' Norwegian Atlantic Smoked Salmon (the "Product").[1]

2.      The flesh of farm-raised salmon is naturally grey or white.  So, to make it a more palatable pink, salmon farmers add color additives to the farmed salmon's feed.  The additives used are one of two chemicals: astaxanthin or canthaxanthin.

3.      Because the fish in Defendants' Product is farm-raised in net-pens in Norway, the only way that the fish get their signature salmon pink is from color additives Defendants intentionally added to the salmon's feed.

4.      Indeed, Independent testing conducted by Plaintiffs' counsel confirmed the presence of astaxanthin in the Product.  Because the Product contains a color additive, Defendants were required to disclose it on the label but failed to do so.

5.      Indeed, "[t]o prevent economic fraud in salmonid fish containing added astaxanthin, the [FDA] requires declaration of the presence of the color additive" on the product packaging.  63 Fed. Reg. 18738 (1998).

6.      Plaintiffs sustained injuries by purchasing Defendants' Product which was deceptively marketed as containing salmon fillets with a healthy, natural pink coloring when, instead, Defendants' farm-raised salmon necessarily contained *artificial* coloring.

---

[1] Discovery may reveal that additional products are within the scope of this Complaint. Accordingly, Plaintiffs reserve the right to include additional items identified through the course of discovery.

7.    Accordingly, Plaintiffs bring claims against Defendants individually and on behalf of classes of all others similarly situated for (1) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.;* (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.;* and (4) unjust enrichment.

## PARTIES

8.    ***Plaintiff David Spero.*** Plaintiff David Spero is a citizen of California who resides in El Sobrante, California.  Plaintiff Spero most recently purchased the Product in or around August 2025 from Whole Foods in Berkeley, CA.  Prior to his purchase, Plaintiff Spero reviewed and relied on the Product's packaging and labeling reasonably understood that the Product contained salmon with a naturally occurring, healthy pink coloring indicative of wild caught salmon. Nowhere did Defendants disclose that the Product's desirable pink color was actually the result of added, artificial color.  As such, those representations and warranties were part of the basis of the bargain, in that he would not have purchased the Product on the same terms had he known those representations were not true.  In making his purchase, Plaintiff Spero paid a price premium due to the false and misleading representation that the Product contains naturally colored salmon filet free of artificial dyes and coloring.  Had Plaintiff Spero known that the Product contained artificial coloring he would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff Spero did not receive the benefit of his bargain because the Product was not, in fact, free of artificial coloring.

9.    Plaintiff Spero remains interested in purchasing the Product from Defendants. However, he is unable to determine if the Product is actually free of artificial coloring and is really on par with the quality of wild-caught salmon.  He understands that the composition of the Product may change over time, but as long as Defendants continue to represent the Product as being akin to the quality of wild-caught salmon, when it is not, he will be unable to make informed decisions about whether to purchase the Product and will be unable to evaluate the different prices between Defendants' Product and competitors' products.  Plaintiff Spero is further likely to be repeatedly misled by Defendants, unless and until Defendants are compelled to ensure that the Product's

marketing as being free of artificial coloring, is, in fact, not misleading.

10.    ***Plaintiff Anas Ryadi***.  Plaintiff Anas Ryadi is a citizen of California who resides in Los Angeles, California.  Plaintiff Ryadi most recently purchased the Product in or around March 2025 through Amazon.com.  Prior to his purchase, Plaintiff Ryadi reviewed and relied on the Product's packaging and labeling reasonably understood that the Product contained salmon with a naturally occurring, healthy pink coloring indicative of wild caught salmon.  Nowhere did Defendants disclose that the Product's desirable pink color was actually the result of added, artificial color.  As such, those representations and warranties were part of the basis of the bargain, in that he would not have purchased the Product on the same terms had he known those representations were not true.  In making his purchase, Plaintiff Ryadi paid a price premium due to the false and misleading representation that the Product contains naturally colored salmon filet free of artificial dyes and coloring.  Had Plaintiff Ryadi known that the Product contained artificial coloring he would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff Ryadi did not receive the benefit of her bargain because the Product was not, in fact, free of artificial coloring.

11.    Plaintiff Ryadi remains interested in purchasing the Product from Defendants. However, he is unable to determine if the Product is actually free and is really on par with wild-caught salmon.  He understands that the composition of the Product may change over time, but as long as Defendants continue to represent the Product as being akin to the quality of wild-caught salmon, when it is not, he will be unable to make informed decisions about whether to purchase the Product and will be unable to evaluate the different prices between Defendants' Product and competitors' products.  Plaintiff Ryadi is further likely to be repeatedly misled by Defendants, unless and until Defendants are compelled to ensure that the Product's marketing as being free of artificial coloring, is, in fact, not misleading.

12.    ***Blue Circle Foods, LLC.***. Defendant Blue Circle Foods, LLC d/b/a Changing Seas is a Delaware corporation with its principal place of business in the District of Columbia. Defendant Blue Circle Foods, LLC markets, sells, and distributes the Product throughout the United States, including in California.  Defendant Blue Circle Foods, LLC manufactured,

marketed, and sold the Product at issue at all times during the relevant Class Period.

13.    **Blue Sea, LLC.**  Defendant Blue Sea, LLC is a Delaware corporation with its principal place of business in Princeton, New Jersey.  Defendant Blue Sea, LLC is the registered controlling company of Defendant Blue Circle Foods, LLC.  Defendant Blue Sea, LLC markets, sells, and distributes the Product throughout the United States, including in California.  Defendant Blue Sea, LLC manufactured, marketed, and sold the Product at issue at all times during the relevant Class Period.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Members of the Classes, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Member of the Classes is a citizen of a state different from one Defendant.

15.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within California, including this District, and purposefully avails themselves to the benefits of this District by selling its Product in this District.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff Spero resides in this District.

## FACTUAL ALLEGATIONS

### A.    The Rise of Farm Raised Salmon

17.    The farmed salmon industry is estimated to be worth $20-billion a year.[2]  "In 2022, more fish were farmed than were captured from the ocean."[3]

---

[2] Douglas Frantz and Catherine Collins, *3 Reasons to Avoid Farmed Salmon*, TIME MAGAZINE (July 21, 2022), https://time.com/6199237/is-farmed-salmon-healthy-sustainable/.

[3] Priscilla Du Preez, *Salmon is Probably Not as Healthy as You Think*, FARM SANCTUARY (Aug. 9, 2024), https://www.farmsanctuary.org/news-stories/salmon-not-healthy/.

18.    Salmon–being high in omega-3 fatty acids, DHA, and EPA[4]–is one of the healthiest foods to consume and the second most popular seafood item in the United States.[5]

19.    Salmon is associated with lowering the risk of stroke, heart disease, and high blood pressure.  It is also known to protect against inflammation, obesity, and cognitive decline.[6]  These factors have contributed to a high demand for salmon.

20.    Because salmon consumption has risen in popularity, wild salmon populations on both U.S. coasts have declined.  Human impacts like dams, overfishing, pollution, and climate change, are largely to blame.[7]

21.    The West Coast is home to 28 different salmonid species.  Their populations, however, have been listed as threatened or endangered under the Endangered Species Act.[8]  But despite their protected status, most of those species continue to struggle and decline.[9]

22.    On the East Coast, Atlantic salmon is the only native salmon species.  Like their West Coast relatives, human activities have decimated the wild Atlantic salmon populations, culminating in the total collapse of Atlantic salmon fisheries[10] by 1948.[11]  Those fisheries never

---

[4] *Omega-3 Fatty Acids*, NAT'L. INST. OF HEALTH (Dec. 17, 2024), https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional/.

[5] Mahita Gajanan, *How Farmers Turn Their Salmon Pink*, TIME MAGAZINE (June 13, 2017), https://time.com/4790794/farmed-salmon-pink/.

[6] *See* NIH, *supra* note 4.

[7] *What is Hurting Salmon?*, WASHINGTON STATE RECREATION AND CONSERVATION OFFICE, https://rco.wa.gov/salmon-recovery/problem/.

[8] West Coast Regional Office, *Report Card on Recovery: Reviews Assess 28 Salmon and Steelhead Species Returning to West Coast Rivers*, NAT'L. OCEANIC AND ATMOSPHERIC ADMIN. FISHERIES (last updated Dec. 11, 2024), https://www.fisheries.noaa.gov/west-coast/endangered-species-conservation/report-card-recovery-reviews-assess-28-salmon-and#:~:text=Under%20the%20Endangered%20Species%20Act,review%20answers%20questions%20such%20as:.

[9] *Id.*

[10] The term "fishery" refers the areas of bodies of water where certain populations of fish can be caught for commercial or recreational purposes.  (For more information *see*, *What is a Fishery*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-au/what-we-are-doing/our-collective-impact/what-is-a-fishery#:~:text=A%20basic%20definition%20of%0a,species%20of%20fish%20or%20shellfish. .

[11] *Atlantic Salmon*, NAT'L. OCEANIC AND ATMOSPHERIC ADMIN. FISHERIES, https://www.fisheries.noaa.gov/species/atlantic-salmon-protected/overview .

---

again reopened and today all Atlantic salmon available for purchase in the United States is farmed.[12]

23.     With the wild salmon population shrinking, but consumer demand for salmon growing, aquaculture (or fish farming) became popularized in the 1960s.[13]

24.     Aquaculture works through the use of net pens that float a few hundred yards offshore that are anchored in place through the use of heavy cables attached to the sea floor.[14] Hatchery-born salmon are transferred to these pens at 10 months old,[15] where they are fed pellets made of fish meal, fish oil, vitamins, color additives, and antibiotics.  Each pen can be home to between 15,000 and 50,000 salmon with a single farm operating between eight and ten pens total.



*Figure 1: Norwegian Salmon Farm*

---

[12] *Id.*

[13] *See* Bruce Barcott, *Aquaculture's Troubled Harvest*, MOTHER JONES (November/December 2001), https://www.motherjones.com/politics/2001/11/aquacultures-troubled-harvest/.

[14] *Id.*

[15] *Id.*

25.     At first, the practice was hailed as a sustainable solution to the increasing demand.[16] But as time went on, the harms of aquaculture became apparent: farms pushed out the few remaining wild salmon populations,[17] hindering conservation and wild salmon population restoration efforts.

26.     Indeed, in "'[e]very place where Atlantic salmon is raised in net-pens, the wild population[s of other salmon species] has declined by as much as 70 percent[.]'"[18]

27.     This is because, in part, farmed salmon are doused with heavy antibiotics and antiparasitics, resulting in the "[f]armed fish contract[ing] antibiotic-resistant strains of furunculosis, a fatal disease that produces ugly skin ulcers; [which then] wild salmon that migrated past their pens also contracted[.]"[19]

28.     Moreover, "[f]armers count on the tide to disperse net pen effluent, but the water often doesn't flush it all away.  A salmon farm of 200,000 fish releases an amount of fecal solids roughly equivalent to a town of 62,000 people."[20]  As such, in areas near salmon farms, "[s]hrimp fishermen began pulling up traps full of farm muck, a gooey black mixture of feces, excess antibiotic-laden fish feed, and decayed salmon carcasses that filtered out of the pens."[21]

29.     This muck also wreaks havoc on natural ecosystems.  Through a process called eutrophication, this muck introduces excess nutrients like nitrogen and phosphorous into the surrounding waters resulting in an algal bloom.  Bacteria feed not only on the muck but on the decaying algae that is inevitably produced in a eutrophic environment.  The bacteria then consume

---

[16] *Id.* ("Back when we envisioned the future in utopian terms, aquaculture was an integral part of the dream.  As surely as we would all drive flying cars, wet-suit-clad cultivators would farm the seas and feed the world with their bounty.")

[17] *Id.*

[18] Melissa Clark, *The Salmon on Your Plate Has a Troubling Cost.  These Farms Offer Hope*, NEW YORK TIMES (Oct. 16, 2023), https://www.nytimes.com/2023/10/16/dining/farm-raised-salmon-

[19] *Id.*

[20] *Id.*; *see also* Stuart Miller, *How the King of Fish is Being Farmed to Death*, THE OBSERVER (Jan. 6, 2001), https://www.theguardian.com/environment/2001/jan/07/fishing.food#:~:text=It%20is%20estimated%20that%20a,a%20town%20of%2020%2C000%20people.

[21] Barcott, *supra* note 13.

vast amounts of oxygen, turning the seabed into an oxygen-depleted "dead zone;" scientifically known as a hypoxic environment, where few organisms can live.

30.    Moreover, the environment that farm raised salmon are raised in is so bad that millions of farm-raised salmon die before ever reaching maturity.  In 2019 alone 25,770 tons, amounting to over ten million salmon, died in their cages.[22]  "The main causes of [those] deaths are said to have been viral, bacterial and fungal infections, along with algal blooms, and 'treatment losses' from mistakes with chemicals or de-licing machines."[23]

31.    Because of these impacts, environmental groups like The Sierra Club have concluded that "aquaculture poses numerous potential environmental risks, including the spread of diseases and parasites to nearby wild fish populations and impacts on wild forage fish populations."[24]  Therefore, many environmental organizations advise against consuming farm-raised salmon.

32.    "The fish-farming industry has fed us a line about eating farmed salmon to protect wild stock … [but a]ctually the reverse is true.  If you purchase farmed salmon, you're contributing to the risk to the wild fish."[25]

**B.    Consumers Prefer Wild Caught Salmon Over Farm-Raised Salmon**

33.    Unlike wild salmon, "[f]armed salmon serves as an inferior food source, accumulating more toxic chemicals in fatty tissue with fewer healthy nutrient properties[.]"[26]

---

[22] Rob Edwards, *Farmed Salmon Deaths From Disease Reach Record High*, THE FERRET (July 13, 2020), https://theferret.scot/farmed-salmon-deaths-disease-reach-record-high/.

[23] *Id.*

[24] *Aquaculture*, THE SIERRA CLUB, https://www.sierraclub.org/grassroots-network/marine-team/aquaculture .

[25] Barcott, *supra* note 13.

[26] *Farmed Salmon Just as Toxic to Human Health as Junk Food*, BEYOND PESTICIDES (June 16, 2022), https://beyondpesticides.org/dailynewsblog/2022/06/farmed-salmon-just-as-toxic-to-human-health-as-junk-food/.

Research shows that consuming farmed salmon leads to higher instances of metabolic disorders like diabetes and obesity,[27] contrary to the largely understood health benefits of salmon generally.

34.    "Some studies warn that a single meal per month of farmed Atlantic salmon can expose consumers to contaminant levels exceeding standards from the World Health Organization. The risk is greatest for infants, children, and pregnant women because of the potential harm from contaminants to developing brains."[28]

35.    Accordingly, nutritionists explain that for consumers get the health benefits of salmon—which consumers like Plaintiffs reasonably expect—they need to eat wild rather than farmed salmon.[29]

36.    Moreover, a blind taste test shows that while consumers preferred the taste of farmed salmon over wild salmon, as soon as the consumers were aware that the salmon was farmed, they indicated that they would still choose a wild salmon product over a farmed salmon product.[30]  Accordingly, whether the product is wild caught or farm raised is material to a consumer's purchasing decision.

37.    Indeed, consumer research confirms that color plays a decisive role for consumers evaluating the quality of salmon at point-of-sale.  In fact, color is considered the consumers' primary consideration in purchasing salmon.[31]

38.    Consumers believe that color indicates a salmon's species, age, origin, price, expected flavor/texture, *freshness*, and quality.  Consumers equate redder flesh as a sign of higher quality salmon and are willing to pay more for deeply colored salmon.

---

[27] *Id.*

[28] Frantz and Collins, *supra* note 2.

[29] *Id.*

[30] Helene Christine Reinbach, *We Prefer Farmed Salmon – As Long As We Don't Know What We're Eating*, UNIVERSITY OF COPENHAGEN FACULTY OF SCI. (Nov. 22, 2021), https://science.ku.dk/english/press/news/2021/we-prefer-farmed-salmon--as-long-as-we-dont-know-what-were-eating/.

[31] Gajanan, *supra* note 5 ("If we didn't do it, customers wouldn't buy it … Consumers buy what they're familiar with.  They won't go into the store to buy white salmon.").

1

2

3

39.     Wild Salmon, which is usually a much deeper red than farmed salmon "fares better on the market because the deep red carries cultural significance, a reminder of a time before mass farming when salmon was 'the fish of the rich.'"[32]

4

5

6

7

40.     Accordingly, salmon farmers admit that if they did not include the color additive in their products, consumers will not purchase the products at all.[33]  Color is so important to consumers that they "will pay up to $1 per pound more for darker colored salmon compared to salmon with lighter hues[.]"[34]

8

9

10

41.     However, once "consumers know that color has been added to farmed salmon, they are less willing to pay for the darkest fish[.]"[35]  For this reason, salmon farmers like Defendants, seek to hide the use of color additives in their Products.

11

12

13

42.     To prevent this fraud, Federal and California law requires that color additives be noted on salmon products to ensure that consumers are *actually* buying what they believe they are buying.

14

15

**C.     Defendants Add Color to the Product to Mimic Wild Caught Salmon**

16

17

18

19

43.     Defendants manufacture, distribute, advertise, and sell the Product, Changing Seas Norwegian Atlantic Smoked Salmon.  The Product is sold online and in brick-and-mortar stores. The Product is made from Atlantic Salmon, a species of salmon that, as explained above, must be farmed.

20

21

22

23

24

25

[32] *Id.*

26

[33] *Id.*

27

[34] *Id.*

28

[35] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



***Figure 2: Product Image***

22      44.      Salmon, like flamingos, get their signature pink color from the food they eat.  In the

23  wild, salmon consume carotenoids from microalgae, phytoplankton, and small fish that, in turn,

24  make the salmon pink.[36]

25
26
27

28  [36] Barcott, *supra* note 13.

45.     But farm raised salmon—which live on a diet of pellets and antibiotics—do not consume beta carotenes.  Thus, farmed raised salmon flesh is grey or white rather than pink.[37]

46.     To achieve the desired pink color, farmers add color additives known as astaxanthin or canthaxanthin.[38]

47.     Since Defendants' Product is farm-raised in net-pens in Norway, Defendants' fish necessarily require color added to their feed to get their signature pink appearance.

48.     Indeed, independent testing conducted by Plaintiffs' counsel confirmed the presence of astaxanthin in the Product.

49.     Because consumers have grown to understand the health benefits of salmon and their preference for brighter pink coloring, fish farmers add pigmentation to the salmon feed.

50.     Fish farmers use a "SalmoFan"—like an artist's color wheel—that help determine how much astaxanthin or castaxanthin a farmer needs to add to the fish feed to achieve the desired color.



*Figure 3: SalmoFan*

---

[37] Gajanan, *supra* note 5.

[38] *Id.*

51.     The inclusion of these color additives is material to consumers because by failing to disclose such additives Defendants' Product mimics that of wild-caught salmon.

52.     Indeed, by concealing the presence of artificial color in the Product, and thereby imitating wild salmon, Defendants unfairly and deceptively disassociate the Product from the real defects of farm-raised salmon including the following:

     (a)    The vast amount of antibiotics, pesticides, and antiparasitics fed to farm-raised salmon;

     (b)    The higher levels of chemicals and other dangerous contaminants found in farm-raised salmon;

     (c)    The higher saturated fat content of farm-raised salmon;

     (d)    The lower beneficial nutrient and omega-3 fatty acid content in farm-raised salmon;

     (e)    The significant source of pollution farm-raised salmon are in the marine environment;

     (f)    The threat farm-raised salmon pose to wild salmon runs; and

     (g)    The controversy around the health risks associated with the artificial coloring agents.

53.     Thus, this artificial coloring serves to mislead consumers as to the true quality of the product they're buying.  Responding to this concern, the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 343, states that a salmonid product is misbranded when the product packaging fails to inform consumers of the presence of the artificial coloring astaxanthin.  Specifically, the implementing regulations require that "[t]he presence of the color additive in salmonid fish that have been fed feeds containing astaxanthin shall be declared in accordance with §§ 101.22(k)(2) … of this chapter."  21 C.F.R. § 73.35(d)(3).

54.     The labeling requirement may be satisfied with statements on the packaging like "'Artificial Color,' 'Artificial Color Added,' or 'Color Added' (or by an equally informative term that makes clear that a color additive has been used in the food)."  21 C.F.R. § 101.22(k)(2).

55.     Laws enacted by most states, including California, also require this disclosure. California Health and Safety Code declares that "[a]ny food is misbranded if it bears or contains

any artificial flavoring, artificial coloring, or chemical preservative, unless its labeling states that fact."  Cal. Health & Safety § 110740.  Moreover, for salmon specifically the California Health and Safety Code expressly incorporates the FDA's labeling requirements.  Cal. Health & Safety Code § 110795.  However, as shown above, the front label, which Plaintiffs viewed and relied on when making their purchases, is entirely devoid of these mandated disclosures.

### D. Defendants Knew or Should Have Known That Consumers Would Be Misled by Their Omissions

56.     Defendants pursued a nationwide policy to violate federal and state regulations by concealing that their Product contained (and continues to contain) artificial coloring.

57.     Knowledge of use of artificial coloring, like astaxanthin, is material to consumers' purchasing decisions.

58.     Not all farm-raised salmon is bad.  Recent development in aquaculture has introduced new systems that raise the salmon "in closed-containment facilities on land.  The fish swim in tanks filled with filtered, recirculated water and the salmon never touch the ocean, eliminating the use of chemicals and damage to the environment."[39]

59.     The way consumers usually understand these differences comes down primarily to consumer perception of the color of the salmon.

60.     Astaxanthin is very expensive, accounting for 20% of the cost of the feed for farmed salmon.[40]  But because color is so important to consumers and results in an increase in consumer purchase price salmon farmers find that adding color additives to the feed is worthwhile.[41]

---

[39] Douglas Frantz and Catherine Collins, *3 Reasons to Avoid Farmed Salmon*, TIME MAGAZINE (July 21, 2022), https://time.com/6199237/is-farmed-salmon-healthy-sustainable/; *see also* Clark, *supra* note 18 ("Now, several land-based farms across the country are beginning to offer a more climate-stable alternative to traditional salmon aquaculture — one that's cleaner, more ecologically responsible and potentially has a lower carbon footprint.").

[40] *Id.*

[41] Donna Byrne, *Disclosing the Potentially Dangerous Dyes that Make Gray Salmon Pink: The California Supreme Court Holds that Actions to Enforce the State's Food Labeling Law Are Not Preempted By Federal Law*, FINDLAW (Feb. 18, 2008), https://supreme.findlaw.com/legal-commentary/disclosing-the-potentially-dangerous-dyes-that-make-gray-salmon-pink.html.

61.     As such, the addition of artificial color to farm-raised salmon increases the marketability of farm-raised salmon and inflates the price of the Product.

62.     However, Defendants did not disclose its use of astaxanthin in the Product. Therefore, Defendants' concealment of artificial coloring in their salmon misled consumers, including Plaintiffs and Members of the proposed Classes, into believing that the salmon they purchased did not contain color additives and/or was of a higher quality than other farmed salmon products.

63.     In line with the F.D.A.'s concern and corresponding labeling requirements, "transparency, better regulation, and accurate labels on farmed salmon are essential to ensure good choices for our health[.]"[42]

64.     But unfortunately for consumers, the Product "looks like it came from the same place as its wild relation, with that rich, pink hue. …. Nothing, apart from the bargain-basement price tag, to give away the reality of intensive salmon production, which has turned the King of Fish into the battery chicken of the seas."[43]

65.     Given consumers' undisputed reliance on salmon color in their purchasing decision, their preference for health-benefit-supporting salmon, and their concerns about farmed fish and artificial coloring agents, consumers like Plaintiffs were injured by Defendants' failure to comply with the labeling requirements.

66.     By concealing the artificial coloring of their Product, Defendants have become unjustly enriched because consumers have been (and continue to be) misled into purchasing the Product in that they would not have done so or would have done so on substantially different terms.

67.     Although Defendants are in the best and exclusive position to know the true composition and contents of the Product, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

---

[42] *Id.*

[43] Stuart Millar, *How the King of Fish is Being Farmed to Death*, THE OBSERVER (Jan. 6, 2001), https://www.theguardian.com/environment/2001/jan/07/fishing.food#:~:text=It%20is%20estimated%20that%20a,a%20town%20of%2020%2C000%20people.

(a) **WHO:** Defendants Blue Circle Foods, LLC d/b/a Changing Seas and Blue Sea, LLC

(b) **WHAT:** Defendants' conduct here was, and continues to be, fraudulent because it had a duty to disclose that the Product contains a color additive but failed to do so on the Product packaging. The inclusion of color additives in salmon products is known to be material to consumers' purchasing decisions by giving the impression that the Product is comprised of wild caught salmon which consumers prefer. Defendants knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiffs and the members of the Classes when they make their purchasing decisions, yet Defendants continued to pervasively and affirmatively warrant and represent that the Product is of a quality and character that it is not.

(c) **WHEN:** Defendants made material misrepresentations and omissions during the putative class period, including prior to and at the time of Plaintiffs' and the Members of the Classes purchases, despite Defendants knowing—or reasonably should have known—that the Product contained astaxanthin. Plaintiffs viewed the packaging and advertising of the Product at the time of purchase and viewed the representations and warranties made by Defendants on the packaging and corresponding marketing, understanding them to mean that the Product was of a higher, fresher, naturally caught composition than farm raised.

(d) **WHERE:** Defendants' marketing messages were uniform and pervasive throughout California and the United States, carried through material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

(e) **HOW:** Defendants made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product did not include color additives and therefore was of a higher quality than it is.

(f) **WHY IT IS FALSE:** Defendants made material representations and warranties that the Product did not include color additives. These representations and warranties communicate to reasonable consumers that the Product is of a "premium quality" comparable to, if not the same as, quality consumers reasonably have come to expect from wild caught salmon. However, and although consumers like Plaintiffs purchased the Product for the purpose of purchasing salmon that was free of synthetic color additives, the Product actually contains astaxanthin.

(g) **INJURY:** Plaintiffs and the members of the Classes purchased, and paid a premium, or otherwise paid more for the Product they otherwise would not have—had they known that the Product contained color additives and so was of a lessor farm-raised quality than a wild-caught quality fish.

## CLASS ALLEGATIONS

68. ***Nationwide Class.*** Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Product during the statute of limitations period.

69. ***California Subclass.*** Plaintiffs bring this California Subclass action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the subclass defined as:

> All persons in the State of California who purchased the Product during the statute of limitations period.

70. Unless otherwise specified, the "Class" shall refer to the Nationwide Class. The Classes collectively shall be referred to as the "Classes."

71. Excluded from the Classes are: (1) persons who made such purchases for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiffs' counsel and Defendants' counsel.

72. ***Numerosity.*** At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members"). However, given the nature of the claims, Plaintiffs believe that Class and Subclass Members are so numerous that joinder of all members is impracticable.

73. There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and fact common to members of the Class and Subclasses that predominate over questions that may affect individual Class Members include:

> (a) Whether the Product contained astaxanthin;
>
> (b) Whether a reasonable consumer would understand Defendants' marketing and packaging to understanding that the Product would be free color additives like astaxanthin;

(c)    Whether Defendants misrepresented and/or failed to disclose material facts concerning the Product;

(d)    Whether Defendants had a duty to disclose the presence of astaxanthin in its Product;

(e)    Whether Defendants' conduct was unlawful;

(f)    Whether the salmon was farm raised or wild caught;

(g)    Whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiffs and the Class and Subclasses;

(h)    Whether Plaintiffs, the Class, and Subclasses sustained damages with respect to common law claims asserted, and if so, the proper measure of those damages.

74.    With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendants violated California Civil Code § 1750, *et seq*., California's Consumers Legal Remedies Act ("CLRA"); California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.* ("UCL"); and California's False Advertising Law, California Business & Professions Code § 17500, *et seq*. ("FAL").

75.    ***Typicality.***  The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like other members of the Class and Subclasses, purchased the Product relying on the representations and warranties made by Defendants on the Product's packaging that the Products did not include color additives.

76.    ***Adequate Representation.***  Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

77.    ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class and Subclasses.  Each individual Class Member may lack the resources to undergo the burden and expense of individual

prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

<u>**COUNT I**</u>
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of Plaintiffs and California Subclass)**

78.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

79.     Plaintiffs bring this claim individually and on behalf of themselves and the California Subclass against Defendants.

80.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

81.     Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

82.     Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

83.     Defendants violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as not containing color additives when it contained astaxanthin, a color additive.

84.     Defendants had exclusive knowledge and/or superior knowledge of the contents of the Product as they were responsible for maintaining their farms and feeding their fish, which was not known to Plaintiffs or the California Subclass.

85.     Defendants made material misrepresentations about the Product to Plaintiffs and the Members of the California Subclass while suppressing the true nature of the Product. Specifically,

by warranting that the Product was "raised to be healthiest salmon you could find" and "fed only premium, nutrient dense foods" so consumers like Plaintiffs associate the Product to wild caught salmon, and failing to disclose that it contained color additives when the Product actually contained astaxanthin, Defendants affirmatively and materially misrepresented the Product as being of a higher quality consumers attach to wild caught salmon when, instead, the Product is farm-raised and colored through synthetic, non-natural alternatives.

86.     Plaintiffs and the California Subclass have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid.

87.     On September 5, 2025, prior to the filing of this complaint, Plaintiffs' counsel sent Defendant Blue Sea, LLC a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  The letter advised Defendant Blue Sea, LLC that it was in violation of the CLRA with respect to the presence of astaxanthin in the Product and demanded that Defendant Blue Sea, LLC cease and desist from such violations and make full restitution by refunding the monies received therefrom to consumers.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

88.     On September 10, 2025, prior to the filing of this complaint, Plaintiffs' counsel sent Defendant Blue Circle Foods, LLC a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  The letter advised Defendant Blue Circle Foods, LLC that it was in violation of the CLRA with respect to the presence of astaxanthin in the Product and demanded that Defendant Blue Circle Foods, LLC cease and desist from such violations and make full restitution by refunding the monies received therefrom to consumers.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

89.     Defendants failed to remedy the issues raised by the notice letters.

90.     Pursuant to Civ. Code § 1780, Plaintiffs and the California Subclass seek: (a) actual damages in an amount to be determined at trail; (b) an order enjoining Defendants from continuing their violative acts and practices; (c) restitution of all money and property lost by Plaintiffs and Members of the California Subclass as a result of Defendants' unlawful conduct; (d) punitive

1    damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

**COUNT II**
**Violation of California's Unfair Competition Law ("UCL")**
**California Civil Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and California Subclass)**

91.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

92.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendants.

93.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

94.    Defendants have violated the UCL's proscription against engaging in **Unlawful Business Practices** by misbranding the Product pursuant to 21 U.S.C. § 343, by violating FDA's labeling requirements for salmon under 21 C.F.R. 101. § 101.22(k)(2).

95.    Additionally, Defendants also engaged in unlawful business practices by misbranding the Product under California law, Cal. Health & Safety Code §§ 110740 and 110795, by failing to follow California's labeling requirements for salmonid fish.

96.    Finally, Defendants engaged in unlawful business practices by violating CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.

97.    In addition, as described more fully above, Defendants' misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, *inter alia*, making the presentation and omission of material facts, as set forth more fully above, thereby violating the common law.

98.    Defendants also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendants' acts, omissions, misrepresentations, practices, and non-

disclosures as alleged herein also constitutes "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

99.    There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described above.

100.    Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices.** Defendants' claims, nondisclosures, and misleading statements with respect to the Product, are more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

101.    Plaintiffs and the Members of the California Subclass suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of astaxanthin in the Product.

102.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

103.    Plaintiffs and the Members of the California Subclass had no way of reasonably knowing that the Product they purchased was not marketed, advertised, packaged, or labeled in conformity with Defendants' representations.  Thus, they could not have reasonably avoided the injury each of them suffered.

104.    The gravity of the consequences of Defendants' conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other Members of the California Subclass.

105.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Classes seek an order of this Court that includes, but is not limited to, requiring Defendants to (a) provide restitution to Plaintiffs and the other Class Members; (b) disgorge all revenues obtained as a result of violations

of the UCL; and (c) pay Plaintiffs' attorneys' fees and costs.

<u>**COUNT III**</u>
**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq.***
**(On Behalf of Plaintiffs and California Subclass)**

106.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

107.     Plaintiffs bring this claim individually and on behalf of themselves and the California Subclass against Defendants.

108.     Defendants' acts and practices, as described herein, have deceived and are likely to continue to deceive members of the California Subclass and the public.  As described throughout this complaint, Defendants misrepresented the Product as not containing color additives and representing to reasonable consumers that the Product is "raised to be healthiest salmon you could find" and "fed only premium, nutrient dense foods" comparable to, if not the same as, wild-caught salmon quality.  However, the Product is not as it gets its pink coloring from astaxanthin, a synthetic color additive.

109.     By their actions, Defendants disseminated uniform advertising regarding the Product to and across California and the United States.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public.

110.     The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Product contains color additives.

111.     Defendants continue to misrepresent to consumers that the Product is "raised to be healthiest salmon you could find" akin to wild caught salmon and does not contain color additives when, in fact, the Product contains astaxanthin.

112.     In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Plaintiffs and the Members of the California Subclass based their purchasing decisions on Defendants' omitted material facts.  The revenue attributable to the Product sold in those false and misleading

advertisements likely amounts to millions of dollars.  Plaintiffs and the Members of the California Subclass were injured in fact and lost money and property as a result.

113.    The misrepresentation and non-disclosures by Defendants and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

114.    As a result of Defendants' wrongful conduct, Plaintiffs and the Members of the California Subclass lost money in an amount to be proven at trial.  Plaintiffs and the Members of the California Subclass are therefore entitled to restitution as appropriate for this cause of action.

115.    Plaintiffs and the California Subclass therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Nationwide Class)

116.    Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

117.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class under the laws of California.

118.    To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

119.    Plaintiffs and the Nationwide Class conferred benefits on Defendants by purchasing the Product.

120.    Defendants were unjustly enriched in retaining the revenues derived from Plaintiffs and the members of the Nationwide Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that the Product contained color additives, rendering their representations that the Product is "raised to be healthiest salmon you could find" and misleading as consumers like Plaintiffs reasonably understood that the Product was

of a wild caught quality instead of the lessor farm raised quality.  These omissions caused injuries to Plaintiffs and the members of the Nationwide Class because they would not have purchased the Product if the facts were known.

121.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the members of the Nationwide Class is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgement against Defendants as follows:

(a)    For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Classes, and Plaintiffs' attorneys as Class Counsel;

(b)    For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper;

(h)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.


Dated:  October 15, 2025          **BURSOR & FISHER, P.A**.

By: ___*/s/ L. Timothy Fisher*_____

L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
Joshua R. Wilner (State Bar No. 353949)
Ryan B. Martin (State Bar No. 359876)

1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          jglatt@bursor.com
          jwilner@bursor.com
          rmartin@bursor.com

*Attorneys for Plaintiffs*

**CLRA VENUE DECLARATION**

I, L. Timothy Fisher, declare as follows:

      1.    I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs. Plaintiff Spero resides in El Sobrante, California. Plaintiff Ryadi resides in Los Angeles, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

      2.    The Complaint filed in this action is filed in the proper venue for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff Spero resides in this District and purchased the Product from a store in this District. Additionally, Defendant advertises, markets, manufacturers, sells, and distributes the Product at issue to Class Members in this District.

      3.    I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this 15th day of October, 2025.

*/s/ L. Timothy Fisher*
L. Timothy Fisher
